Your case is Deborah Laubscher, Robert Laubscher as surviving parents of Danny Laubscher v. Gwinnett County 25-10323. I am pausing over the pronunciation of your last name so I invite you to correct me, Mr. Acharya. Acharya.  I was close. You may proceed and I do see that you have reserved some time for rebuttal. Good morning, Your Honors, and may it please the Court, Mr. Acharya, for the appellants Deborah and Robert Laubscher. This is not an excessive force case. This is not about what Kevin Mendez did or didn't do on that fateful evening at the Laubscher residence. It's about what he didn't have. He didn't have the training he needed to offer Danny Laubscher what Gwinnett County promises everyone else, help in an emergency. He didn't have the resources that he might have had in other jurisdictions, like a mental health co-responder that he could call on, or a remote clinician to help de-escalate over the phone, or even just a briefing that Danny's condition made them a high utilizer. These failures are Gwinnett's failures, and under the ADA, they're unlawful. If you call 911 about a burglary, Gwinnett sends police officers trained to fight crime. If you call about a heart attack, Gwinnett sends EMTs trained to administer CPR. But if you call about a mental health crisis, Gwinnett sends police officers armed, untrained, to moonlight as social workers. I think a problem that I see is that you're trying to divorce what the manifestations of his mental health problems from the response. I think it would be different if he were, if he had not had a weapon, say, I mean, wouldn't it be irresponsible to send a completely unprotected clinician up the stairs to have a discussion with him? I'm just not sure how that would work in practice. In practice, your honor, I don't, I think the specific events of what happened that evening are not really relevant to how we've shaped the claim on appeal. So I don't know. I guess I'm saying I'm not sure if that works because if it would be impossible to put the actions into practice that you're saying were legally necessary, then it's harder for me to understand how those could have been legally necessary. Sure, your honor. So sending a clinician, sending a mental health correspondent is one of the accommodations. It is one that other jurisdictions use. So it works in Phoenix, for example. But setting that aside, the law officers identified several accommodations that Gwinnett could have offered to accommodate people with mental disabilities, and Gwinnett used none of them. Another one, I think the main one that we really discussed, is crisis training all of the police officers that Gwinnett employs. This is an accommodation that is, and our burden at this stage, at the pleading stage, is to show that it is, that that accommodation is facially reasonable. So it's reasonable in the run of cases to do. And here it is because it is standard for other jurisdictions similar to Gwinnett to crisis train their police officers. So can I ask you just sort of a general causation problem? I understand you're now focusing your proposed accommodations on the county's policies and training practices. But don't you still need to show, though, show that if the policies had been in place, the outcome on April 30th, when Danny was killed, would have been different? I don't think so, Your Honor. Because the question is not whether crisis training, for example, would have prevented Danny's death. The question under the ADA is whether crisis training would have given Danny an equal opportunity to benefit from Gwinnett's emergency services. So sometimes police respond to non-disabled prisoners, or sorry, non-disabled people, and they end up having to use force. Well, I guess that's what, so we do still have to look at the events of April 30th. And I'm just trying to, you know, the firefighters who were first on scene had the training that, as I understand it, that you're talking about. They had some, and they were trying to, they were certainly trying to de-escalate the situation, as you have been describing. So, and that's what comes out from the body cam footage. So how can we conclude that the crisis intervention training for everyone would have changed the ultimate outcome? So, a few things on that, Your Honor. First, on this record, which is at the pleading stage, the firefighters did not have crisis training. They were trained as EMTs, which is not the same thing as crisis training. Okay, so take away that part of it. They were, nonetheless, first on scene trying to de-escalate. Would you agree with that? That's right. They were. They were trying to de-escalate. And then the officers show up. So there's a couple of things. So the firefighters who were, in fact, the ones trying to de-escalate first on scene, would the training that you're talking about have changed the firefighters' response? Probably not, Your Honor. But once the officers showed up, they took charge of the scene and the officers didn't have crisis training. But you, in paragraph 143 of the complaint, said the fire personnel began to administer emergency mental health care. Okay. In your own complaint, you said they did it right. They were speaking calmly, quietly, I'm here to help. That's what you wanted the police to do. Yes. Your complaint alleges, I agree with Judge Brandt, that the firefighters were maybe, I don't know whether they were doing it without training, but that they were administering, you say, emergency mental health care. The complaint says that. Okay. But the complaint also says that they were trained as EMTs. It does not say that they were crisis trained. So they were doing the right thing. They certainly, both of those things could be true. I mean. Could be true. Yeah. But just not on this, at the pleading stage. But you are, you had acknowledged that the firefighters did sort of implement a mental health response and were attempting to de-escalate. I think the firefighters were doing the right thing. Okay. But so now you have the police officers who arrive on scene. De-escalation did not work and Danny had a weapon. And so I guess I'm just trying to, again, back to sort of the causation. If all of the other policies were in place, how would it have changed the situation on April 30th? So, I don't think it's quite right to say de-escalation did not work. It was given a few minutes, less than five minutes to work. There was a weapon involved.  That's right, Your Honor. But there was, you know, it was a knife, it wasn't a gun, there was distance. Still a weapon. Yes, Your Honor. Of course. And the distance was shortened after the Taser incident and when Danny fell down the stairs. So all of a sudden there's a, you know, distance has been eliminated. So perhaps I can address this a different way. Suppose the officers have been crisis trained. Suppose Kevin Mendez had been crisis trained. He shows up. He takes charge of the scene. This seems to be from the complaint. We allege that, you know, he was in command of the scene. It's a reasonable inference also from the video, so I think we're entitled to that fact. But he shows up. Maybe he doesn't say, you know, get out of here to the firefighters. Maybe he lets the firefighters continue to de-escalate. Maybe he doesn't start yelling conflicting commands to Danny. Maybe he doesn't go straight to the Taser. He doesn't pull his weapon. There are all sorts of possibilities here. None of them, I think, like are relevant to how we're shaping the complaint, which is that by not having crisis training, Kevin Mendez sending untrained officers to take command of the scene denied Danny an equal opportunity to benefit from Gwinnett's emergency services. Exactly how that might have played out is impossible, I think, for anyone to say. That would require clairvoyance. I can't say. But what I can say is it is the collective experience of policing over the last 50 years that crisis training improves safety for the officers and the individuals involved. But what about the fact that your clients never asked Gwinnett County to change its policies to accommodate Danny? So that request requirement, Your Honor, for deliberate indifference, there is not a request requirement under Title II. And there's not really a request requirement for policy-level accommodations either. In the cases where this Court has required a request, those are Title I cases. I think it's Gaston and Willis. Those are employment cases. And it makes sense there because there you're going into work every day. There's an interactive process where you say, I can't do this work with my disability. And the employer says, well, what can we do about it? So on. In the case of, for example, in Shotz, the Shotz case, there was no request for wheelchair ramps. There was no request for accessible bathrooms. And it doesn't make sense to require a request for something that's sort of a structural accommodation that is or is not offered. The first time a disabled person comes to your courthouse and is unable to get to the courtroom because there's no elevator is still an ADA violation, even if the person hasn't requested it beforehand. And asking, mandating a request requirement in the context of policy-level changes especially makes even less sense because, or sorry, for emergency services, it makes even less sense because you don't know when and where you will need emergency services. That's the whole point of emergency services. If we were talking about on-the-scene accommodations, I think a request requirement might make sense. But talking about policy-level accommodations, the question is, did Gwinnett know that it gets thousands of mental health crisis calls every year? Yes. Did it know that it used police officers as a de facto first responders to those mental health crises? Yes. Did it know that it was not giving them the crisis training that they needed to respond effectively to those mental health crises? Yes. All right, but do you point to any prior incidents, okay, where they failed, where you say this, they were aware that their policies, I understand it's an ADA case, not Eighth Amendment, but still it seems like the same standard would apply, that they'd have to be aware that there were prior times their policy didn't work for it to have be a reasonable accommodation. So my question is in this record. I didn't see any time you say any other prior incidents. Is that correct? I know you say you don't need them, but you don't put in the evidence of prior incidents, do you? That's correct. Okay. And the reason that we don't need them, Your Honor, is because... To show the policy's not working. That's right. And the reason that we don't need them is because the requirement for prior similar incidents comes from the failure to train line of cases. Now this case has a failure to train in it. Obviously, that's one of the main accommodations that we identified. But failure to train is a different doctrine that applies when the failure is not itself the violation, but the failure to train causes the violation. So suppose we'd frame this as a Fourth Amendment claim that we tried to bring against Gwinnett, saying that it's failure to train his officers in crisis intervention caused them to violate Danny's Fourth Amendment rights. So failure to train can never itself violate the Fourth Amendment. So we would have to show that there had been a pattern of prior similar incidents where officers had violated mentally disabled people's Fourth Amendment rights to impute the knowledge to Gwinnett that its training was insufficient and causing officers to violate constitutional rights. But here, the failure to train is itself the ADA violation. So failure to train can never violate the Fourth Amendment, but it can violate the ADA. Failing to train is essentially the same as not building a wheelchair ramp or installing an elevator. Those are accommodations for physical disabilities. So physical disabilities require physical accommodations. Mental disabilities require behavioral accommodations. You can't accommodate a mentally disabled person with physical accommodations. The accommodations is how you interact with them, how you treat them, how you talk to them. And that means that training is the equivalent to something like an elevator or a ramp. One element of any of these is that the person has to be a qualified individual, right? That's right, Your Honor. So, I think that Gwinnett County has probably forfeited this if it applies anyway by not raising it before, but under 28 CFR section 35.139, an individual that, quote, poses a direct threat to the health or safety of others is not a qualified individual. Do you think that that would apply to your client? I, so I do think Gwinnett has forfeited that by not raising it. I don't think it would apply to my client here because the fact of crisis training would reduce the threat that Danny would have presented. I don't know that crisis training would reduce the threat of a person who's in a mental health episode and has a knife on stairs, right? I mean, is the idea that he, I mean, the authorities were called because there was a problem, right? I mean, the whole situation is obviously a tragedy, but the authorities were called in the first place because there was a problem, right? That's right, Your Honor. But, and we've alleged, and this is, I don't think it's disputed, it can't be disputed at this stage, that crisis intervention training has proven effective at increasing the safety of these encounters. My point is not that, though. If we're looking, if we're looking at what kind of programmatic changes any jurisdiction would be required to make, wouldn't we consider this restriction even if it doesn't apply to your client, right? So this becomes complicated, but if we're, if we're looking at whether a county has to take certain steps to more effectively deal with people who are having a violent mental health crisis under the ADA, doesn't it matter that a person who poses a direct threat to the health or safety of others isn't qualified? Doesn't that suggest that the ADA is not designed to deal with this sort of scenario? I, I, so I think this Court's decision in Bercall sort of forecloses that line of argument. I don't know if Bercall looked at that part of the CFR, but what Bercall says is that the ADA applies even in arrests. It says that. It says it applies even in arrests, and then the question just becomes what accommodation is reasonable. Oh sure. I mean, but, I mean, but of course it means you can't, I mean, I'm not going to pose hypotheticals about what you can't do because they would be offensive and terrible likely. I'm not at all suggesting that, but the, it doesn't say that, that the ADA doesn't apply to people being arrested, but it says to be a qualified individual to raise a specific claim under the ADA, right, you, it can't be, you can't be a person who was posing a threat to others. Maybe there are plenty of other kinds of claims you could raise or if you're being arrested and you're not a threat to others, certainly then the authorities have to respect your rights under the ADA. So since this wasn't briefed, Your Honor, I, I, I have a memory of some cases addressing this CFR, but I don't know what they are. That's fair. I'm, I'm just bringing it on you. I will, I will happily submit a supplemental briefing on that issue if the Court wants to, wants to consider it. Thanks. I have a follow-up question back to that you, the fact that you haven't pointed to any prior incidents and you resist sort of putting this claim on, on par with a Section 1983 failure to train claim and you, you said, and if I am quoting you incorrectly, that the failure to train is the ADA violation, that there's no need to have, that Gwinnett County doesn't need to have knowledge of prior incidents, correct? That's right, Your Honor. So I'm looking at the Silberman case, one of our cases, that when a plaintiff seeks damages under, under the ADA, he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of deliberate indifference. And let me just keep going on this case to sort of link a couple of things. Deliberate indifference requires proof that the defendant here, Gwinnett County, knew that harm to a federally protected right was substantially likely and failed to act on that likelihood. When the government, when the defendant is a government entity, as certainly is the case here, the plaintiff must demonstrate that an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf had actual knowledge of discrimination in the entity's programs and failed adequately to respond. So how do you avoid that the fact that pursuant to that case, you would need to show that Gwinnett County was on notice that it was violating the ADA? Yes, it is actual knowledge of discrimination, Your Honor. So it's, if our argument is that the failure to train is itself violating the ADA because it, the accommodation that mentally disabled people require is crisis training. So the mere fact that Gwinnett County did not have these policies put Gwinnett County on notice that it was violating the ADA? The fact that it didn't have these, that it didn't require that training, that Gwinnett County, top Gwinnett officials, we allege that they don't dispute, knew that Gwinnett received thousands of mental health crisis calls every year and they were sending these untrained officers to deal with these crisis calls, yes, that's enough. But they don't, so you're saying we don't have to then have as a piece of the puzzle that Gwinnett County, knowing that there are however many thousand mental health calls a year, didn't have to know that there were outcomes following those calls that could have been ameliorated had the policies been in place. That does not exist. Correct, because in tort terms, what the knowledge is needed is knowledge of the breach, not knowledge of particular harms that may flow from the breach. In Silva and Crane, this court discusses this distinction. You don't have to know that someone was misdiagnosed because you didn't give them auxiliary aid. You just have to know that you didn't give them an auxiliary aid and they had a hearing disability. But so how does Gwinnett County not think, okay, I know we don't have specific mental health training for police officers, and I'm not trying to assume that that's correct, but let's just assume in this hypothetical, hey, we know we don't have specific mental health training for police officers. We know we get mental health calls all the time. How is that intentional discrimination? If you don't show that things went awry on some of those calls, how is Gwinnett County intentionally discriminating? Why aren't they thinking, oh, we don't need it? The police officers, through their normal police officer training, are handling the situation well. Because Gwinnett County doesn't exist in a vacuum, Your Honor. There are some 18,000 policing jurisdictions in the country. The collective experience of those jurisdictions is that crisis training is a necessary accommodation for people with mental disabilities. The Georgia Chiefs of Police have said so. It says so on the tin. The training that the state of Georgia offers at its police academies for crisis intervention says this is for the purpose of enabling police jurisdictions to comply with the ADA to accommodate people with mental disabilities. To say the county of Gwinnett doesn't exist in a vacuum, its chief of police, I assume, is a member of the Georgia Chiefs of Police. And that is one of the organizations that has said that crisis training is a necessary accommodation for people with mental disabilities. All right. I've taken you over time. Thank you, Your Honor. But you still have your time for rebuttal. I appreciate that. Mr. Walker. Good morning, Your Honors. May it please the Court, Blake Walker on behalf of Appalachia-Gwinnett County. The Court should affirm the District Court's decision because it correctly held that the lobsters' failure to accommodate claims proposed accommodations that were unreasonable as a matter of law. And even if the lobsters' proposed accommodations were not unreasonable as a matter of law, the Court should still affirm because dismissal is appropriate because deliberate indifference has not been shown here. Can you elaborate a little bit on how these were unreasonable proposed accommodations? Sure. So first, in the Burkle case, which this panel is very aware of, this Court held that it's unreasonable to provide accommodations to disabled individuals during exigent circumstances. Exigent circumstances there, it was a DUI stop on the side of the interstate in Miami. Late at night, the plaintiff there was not armed, didn't even have a knife. Nonetheless, this Court held that exigent circumstances were present because of criminal activity, the need for quick decision-making by the police, and the general onerous tasks that police are facing. Let me focus you. That was, my question was a little too broad. Are you saying it is an unreasonable accommodation to require police officers to have mental health training? Not necessarily. Well, the plaintiffs here, the lobsters, they point and they say that there's other places that do this. There's other jurisdictions in Georgia and elsewhere that have this training, but I think that argument goes more to the undue burden argument. That would be the defense's argument. Our argument is it's not reasonable, one, in the run of the cases. So, in the run of the cases, it's inappropriate to ask, what do other people do? It's more appropriate to say, is this request reasonable generally? That's from the U.S. Barnett case. Once there, they said it was unreasonable to put an employee with back problems into the mailroom in violation of the seniority program, but that would be general in other companies. So, should I take it from this conversation that we're having that Gwinnett County police officers do not undergo mental health training? That's what's been alleged in the record, Your Honor, and that's what's before us today. But going back to the reasonableness, and I think this will clarify the argument a little bit, especially Judge Grant's questions earlier to the other side, is reasonableness is also a specific, individualized inquiry depending on the disabled person's disability, what services, programs, or benefits of the government that they are seeking, and how the accommodation that they propose would allow them equal access to those services. Here, there was no request. There was no request to accommodate Danny or to accommodate mentally disabled individuals generally within Gwinnett County, so there was no ability to get into that discussion. What do you make of his point that you don't have to prerequest a wheelchair ramp? That may be true in the Schott's case. I believe it's from the Fifth Circuit. It does say that if it's obvious what the disability is, you don't have to request it, but it also says it has to be obvious what the remedy would be. Painting all mentally disabled individuals as needing the same accommodation no matter what is incorrect, I believe. Even in Burkle, this court held that providing a roadside interpreter may be inappropriate and unreasonable on the side of I-75, but that may be an appropriate accommodation at the police house. The same was said in the Lease or Leasy case, an ADA case where the court said it's probably reasonable to have an interpreter for a deaf individual when they're having a conversation with their surgeon, but it may also be reasonable in the gift shop to just exchange notes. So, it's a very specific, individualized inquiry about what would be reasonable here. And that also goes to the causation issues that this court brought up earlier as well. Frankly, it's been hard for me to wrap my head around this case because it's a failure-to-train type allegation, and they're saying we're not even saying that there was a statutory violation at the Lobsher home. It's hard for me to see how there would be any causation in that case as well. Do you agree they're saying that they don't have to show that Gwinnett County was on notice of any prior incidents where, like, things went off the rails in a mental health crisis situation when law enforcement was called? That simply saying Gwinnett County doesn't provide mental health training to its officers, Gwinnett County knows that it receives thousands of phone calls that involve a mental health crisis, and because if Gwinnett County looks to sort of law enforcement standards generally, Gwinnett County is on notice that it would be a good thing to have mental health training for its officers. Is that enough? I don't think it is, and there's a few reasons why I think that. First, if that were the standard, then police forces around the country would be deliberately indifferent to discrimination every time they send an officer out. It's going to be substantially likely that an officer in their career, probably month to month, is going to run into somebody who has a communication disability. They're deaf or mute or blind, whatever it may be, and I don't think failure to train on that means that they're deliberately indifferent to that risk. Furthermore, it goes back to the individual, the issue that this is an individual inquiry. The mere fact that the police are being sent out and they're not trained on this doesn't mean that there was discrimination in any of those occurrences, any of those thousands of calls that they allege. There's not discrimination under the failure to accommodate theory unless a reasonable accommodation has been requested and denied, and it's not deliberate indifference unless a policymaker knows about that deliberate indifference and refuses to change it. So, by merely saying that officers aren't trained in this area, that can't be the breach and the evidence of deliberate indifference at the same time. There needs to be some kind of actual knowledge that the officers know they are discriminating based on their policies. Also, looking at the ADA cases about deliberate indifference, the Lee's case and the Silberman case, again, those were individualized patients. They were patients that were unable to communicate or unable to get on the bus, and the court held that the only way there's deliberate indifference is if there's a policymaker, either in the bus, the Dade County Transportation Authority, or the hospital that knew about that discrimination and refused to change it, that had the authority to change it. Here, that was a theory that they raised at the district court, the lobsters did, that Officer Mendez or somebody like that at the scene may have known that what was going on was discrimination and didn't change it, but that's not their theory anymore. Again, the reason for this kind of strange theory, I think, the failure to train is they're trying to sidestep Buerkle. Buerkle should control here there were exigent circumstances. I understand that you've seen the video and that, of course, read the district court's order about the exigent circumstances that were present, and if there were exigent circumstances in Buerkle, then there certainly was here. Your Honors, I don't believe that just making the argument that policymaking is enough to get away from the exigent circumstances. That would be similar to saying in Buerkle, accommodation wasn't to provide a roadside interpreter. Instead, the accommodation should have just been, we want to train our officers in a way that would allow them to know when to communicate or when to call an interpreter or how to call an interpreter. As my friend across the way argued, not even know how it's going to work out. Just know that it's an ADA violation not to train that officer that pulled over Stephen Buerkle. There's some causation issues there, and I think that it's unreasonable to say that it was a failure to accommodate in that case. Your Honors, we would also argue that this theory itself would just, it's greatly expanding Title II ADA accommodation claims. One piece that is evidencing that is this court held in Gaston that someone needs to request an accommodation for the duty to accommodate to trigger. That was a Title I case, and it's true that we're in Title II here, but as the panel knows, Title II does not include the statutory language about failure to accommodate. That language isn't in Title II, but it's in I and III. So if this court were to say in Gaston, Title I, you've got to request an accommodation before that duty is triggered, but you don't have to in Title II. That would be reading the implied language in Title II more broadly than the express language that's in Title I. It's also worth noting in that Gaston case, there was actual knowledge of the disability. The person in that case, the individual was an employee with a disability that didn't allow them to bend over or pick up weights. New management took over the company, and they knew that there was an individual with that disability, but changed the job duties anyway. That employee ended up quitting and saying, you didn't accommodate my disability. This court said it doesn't matter. There was no accommodation that was requested. So, Your Honors, because of these reasons, we would request that you affirm the district And I'd be happy to answer any more questions that you all may have, but if not, we'll rest. Thank you. Thank you. You have three minutes for a rebuttal. My friend on the other side, I heard him say that reasonableness is a specific, individualized inquiry. That is not right, and I think it may be worthwhile to just go through the analytical framework from just the bare bones of it. The plaintiff's burden is to show that an accommodation, identified accommodation, is reasonable on its face in the run of cases. It is specifically not an individualized inquiry. The individualized inquiry comes at the affirmative defense stage. Once a plaintiff carries their burden to show that there would have been an accommodation that was reasonable on its face, which in Shaw, this court emphasized, is a low bar. Once a plaintiff has crossed that low bar, then the defendant has the burden to show that under its specific, fact-specific, case-by-case inquiry as to its programs, those accommodations would have been either unduly burdensome or fundamentally altered the program. Gwinnett, that's the only place that a specific, individualized inquiry comes in. It comes in at the affirmative defense stage. Do you have a case applying the specific burden-shifting framework to the Title II context, certainly in Title III? I don't know if there is a specific case doing the burden-shifting in Title II, but this court has uniformly said that the reasonable accommodation framework is in pari materia for Title I, Title II, Title III, for that matter, the Fair Housing Act as well. So I don't think, there's no basis in this court's jurisprudence to say that that burden-shifting wouldn't apply in the context of Title II. But you don't have a specific case speaking to it? Not one that leaps to mind, Your Honor. What do you think you have to show as the connection between the accommodation that you're requesting and what would have happened on that day? I don't think we have to show anything for this type of accommodation, Your Honor. If the accommodation we were requesting, suppose Burkhall didn't exist and we were requesting an accommodation that Kevin Mendez had done specific things at the scene, then I think we would have to show that it would have caused him to not kill Danny if he had done those specific things. Burkhall, as we read it, as I think my family outside read it and the court reads it, Burkhall forecloses us from saying Kevin Mendez should have accommodated Danny by doing things differently. But Gwinnett County could have accommodated Danny by training. I guess the reason I ask is that in both your ADA claim and your Rehabilitation Act claim, you said the fatal shooting of Danny Lobster was a direct and proximate result of the county's violations of whichever statute. So I guess what I'm asking is why did you plead that? What relevance do you think that assertion has to both of your claims? When this claim was in the district court, when this case was in the district court, there were both at-the-scene accommodations that were pleaded and policy-level accommodations that were pleaded. On appeal, we have shaped the appeal. We are not appealing the result as to the at-the-scene accommodations. We are only at this point identifying... So you just think it's totally irrelevant then? I think the discrimination that we're identifying now... The answer is yes, Your Honor, because the discrimination that we're identifying is Gwinnett's failure to train. It's the same as failing to build a ramp, failing to install an elevator. That discrimination happens. The causation is that by failing to train its officers in crisis training and sending them to mental health crisis calls without that training, Gwinnett caused discrimination. The discrimination happens at that point. No, I mean, I get it, but by failing to build a wheelchair ramp, the person didn't have a way to get in, and if the county had built a wheelchair ramp, they would have had a way to get in. Don't you... You don't have to make any connection between what would have happened had these policy or what would happen in the future in a similar case if these policy interventions were required? Well, it's impossible to say on any given specific case, but in the aggregate, across cases, it is the collective experience. I mean, this is... I'm quoting... Well, I can't quote, but I will paraphrase what the Georgia Chiefs of Police say, which is that crisis intervention training is necessary to improve the safety both of individuals and the officers that are involved, and crisis training improves outcomes, reduces violent outcomes, reduces deaths. And that's something that the state of Georgia says when it offers a crisis training course at its police academies. It's something that the Georgia Chiefs of Police say, Georgia Sheriff's Association, a number of policing experts in the state and across the country. So, in the aggregate, yes, it does improve outcomes, and I think that's the causation that's necessary. If the Court has no further questions, I am well past my time. Thank you. Thank you both. We have your case under advisement. Thank you. Thank you. Our final case...